IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CALVIN WHITING,                    )
                                   )
              Plaintiff,           )
                                   )
     v.                            )    No. 12 C 2917
                                   )
WEXFORD HEALTH SOURCES,            )
INC., *et al.*,                    )
                                   )
              Defendants.          )


MEMORANDUM OPINION AND ORDER

Calvin Whiting ("Whiting") alleges that Alfonso David, M.D.
("Dr. David") and his employer, Wexford Health Sources, Inc.
("Wexford"), were deliberately indifferent to his medical
condition--swollen lymph nodes that were diagnosed as cancerous
two months after they appeared--while he was incarcerated at an
Illinois prison.

Dr. David and Wexford have filed separate motions for
summary judgment, which I grant for the reasons stated below.

I.

At the summary judgment stage, I must view the evidence in
the light most favorable to Whiting and draw all reasonable
inferences in his favor. *See Shields v. Ill. Dep't of
Corrections*, 746 F.3d 782, 786 (7th Cir. 2014). I will not,
however, credit any Local Rule 56.1 statements and responses

1

"that consist of hearsay, speculation, legal conclusions, improper argument, and evasive denials, in addition to those that do not properly cite to the record, are unsupported, or are otherwise improper." *Boudreau v. Gentile*, 646 F. Supp. 2d 1016, 1019 (N.D. Ill. 2009).

Whiting began his prison sentence at the Hardin County Work Camp and its parent institution, the Shawnee Correctional Center, in July 2010. Defs.' Statement of Facts ("DSOF"), Dkt. No. 172, at ¶ 68. On October 15, 2010, Whiting complained to a nurse about "nodules" or growths on his left jaw and in his left groin area. *Id*. at ¶ 12. He reported increased tenderness in these regions and pain in his left ear. *Id*. The nurse who examined Whiting prescribed an antibiotic (amoxicillin) and a pain reliever (Motrin) based on her impression that he may have had an ear or throat infection. *Id*.

Ten days later, Whiting reported to a nurse that Motrin had not relieved his pain and showed her two new "bumps" on his neck. *See* Dkt. No. 173-3 at Whiting Ex. 009. The nurse scheduled Whiting to see Dr. David, the Medical Director at Shawnee Correctional Center, during the next sick call. *Id*. The next day, Whiting complained to a different nurse, "I'm getting more of these lumps all over my body. I can't eat or sleep and [am] getting more pain all over." *Id*. at Whiting Ex. 012. The nurse observed "multiple enlarged nodes" on Whiting's

2

neck and a firm, enlarged mass on his left jaw. *Id.* Per Dr. David's instructions, she admitted Whiting to the prison's infirmary. *Id.*

Dr. David examined Whiting on October 27, 2010. *Id.* at Whiting Ex. 021. Whiting complained that he was "dying." *Id.* After observing Whiting's symptoms, Dr. David submitted a request to Wexford for a biopsy of the mass on Whiting's left jaw to determine whether lymphoma--a cancer of the lymphatic system--was causing his enlarged nodes. *Id.* Dr. David could have ordered an emergency biopsy on his own, but decided to submit his request through Wexford's collegial review process. Dkt. No. 165-1 ("Dr. David Dep.") at 29-30.

Dr. David and a doctor on Wexford's collegial review committee discussed the biopsy request. DSOF at ¶ 80. On November 1, 2010 Wexford denied Dr. David's request for a biopsy, but recommended an alternative treatment plan. *Id.* at ¶ 81-82. Specifically, Wexford recommended trying a course of two antibiotics, one after the other, and resubmitting the biopsy request if necessary. Dkt. No. 173-3 at Whiting Ex. 026. Although only a biopsy could have determined whether Whiting had lymphoma, Dr. David explained that Wexford's recommended course of treatment was consistent with his initial impression that Whiting had an ear or throat infection. Dr. David Dep. at 59.

If Whiting responded positively to the antibiotics, it would have been less likely that he had lymphoma. *Id.*

After Wexford denied his biopsy request, Dr. David summarized this thought process as follows:

> [M]y initial impression of the presented signs and symptoms was an infectious process going on. And while in my mind there's that possibility of blood dyscrasia such as lymphoma present in this patient, I was directing more [of] my attention or the treatment or management to my impression at that time. We don't right away do an invasive procedure on anyone presenting with earache or sore throat or enlarged lymph nodes, such as a biopsy of those lymph glands. We would rather consider treatment for whatever we think the patient is having at that time. And, going further, when collegial review denied my request for a biopsy but gave an alternative plan of trying additional courses of antibiotics, I thought it was a reasonable alternative plan at the time. But, at the same time, they gave a recourse that if those trial of antibiotics will not work that I can submit my request for a biopsy again, which was done in [December 2010].

*Id.* at 61-62. Dr. David explained the alternative treatment plan to Whiting on November 1, 2010 and started giving him the first of the recommended antibiotics and pain medication. Dkt. No. 173-3 at Whiting Ex. 045.

Whiting showed signs of improvement in response to the antibiotics, but sometimes voiced complaints of pain and frustration about not having a definitive diagnosis. DSOF at ¶¶ 9, 13. On November 3, 2010, a nurse observed that Whiting's "scattered and circular lesions appear[ed] to be decreasing in size and redness" and were "not as severe as one week ago."

Dkt. No. 173-3 at Whiting Ex. 051. Three days later, on November 6, 2010, a nurse reported that the mass on Whiting's neck had decreased in size and the areas on his back and chest "continue[d] to improve." *Id*. at Whiting Ex. 060. Whiting's condition then started to decline. He reported a "new bump" and increasing pain on November 7, 8, and 9. *Id*. at Whiting Ex. 062, 064-065. By November 29, 2010, Whiting was complaining of multiple "knots" on his body. *Id*. at Whiting Ex. 087. The nurse who examined Whiting that day observed nodules at the edge of his hairline, on both sides of his neck, under his left armpit, and on his right deltoid. *Id*. She scheduled Whiting to see Dr. David during the next sick call. *Id*.

Dr. David examined Whiting on December 2, 2010. *Id*. at Whiting Ex. 092. Whiting was "very upset" and claimed that Dr. David was "letting him die." *Id*. Dr. David explained why Wexford had denied his first request for a biopsy, but decided to resubmit the request. *Id*. Wexford approved Dr. David's request on December 6, 2010. DSOF at ¶ 14.

A biopsy performed on December 21, 2010 revealed that Whiting had a rare and aggressive type of non-Hodgkin's lymphoma. DSOF at ¶ 11.[1] As soon as Dr. David received a verbal report of the biopsy results, he advised Wexford of the findings

---

[1] Whiting's precise diagnosis was Stage IV ALK positive anaplastic large cell lymphoma, which represents less than five percent of all non-Hodgkin's lymphomas. DSOF at ¶ 57.

and requested that Whiting be referred to an oncologist and receive CT scans of his chest, abdomen, and pelvis to determine the extent of the cancer.  *Id*. at ¶ 16.  Wexford approved the referral and scans Dr. David had requested.  *Id*.

From January 2011 to May 2011, Whiting received chemotherapy treatment from Dr. Mahnaz Lary, an oncologist in private practice.  *Id*. at ¶¶ 17, 34-37.  Whiting's lymph nodes started to shrink right away.  *Id.* at ¶ 48.  On June 9, 2011, PET scans revealed that Whiting's lymphoma was in complete remission, which was the best possible result he could have achieved.  *Id*. at ¶¶ 41, 48, 58, 70.  Dr. David was responsible for approving every step of the chemotherapy treatment and scans Whiting received while under Dr. Lary's care.  *Id*. at ¶ 54. When Whiting complained to Dr. Lary that Dr. David was neglecting him, she "reassured him that his medical care, other than the fact that the prison system limited us in the speed of what we needed to do, was fine."  *Id*. at ¶ 46.  Dr. Lary never had issues with Dr. David's attentiveness to Whiting's case and was able to provide all of the medical care she thought was necessary and appropriate.  *Id*. at ¶¶ 38, 53-54.

When asked whether any delay in performing a biopsy on Whiting's enlarged lymph nodes and starting his chemotherapy treatment had a negative impact on his prognosis, Dr. Lary testified that any such delay was medically "irrelevant" and did

not "harm" Whiting because his lymphoma reached the point of complete remission. *Id.* at ¶¶ 39-40. In Dr. Lary's opinion, any delay in the diagnosis of Whiting's lymphoma had no causal connection to whether he would suffer a relapse. *Id.* at ¶ 43-44.

After Whiting finished his chemotherapy treatment, Dr. David noticed that Whiting had developed a "pea-size node" on the front of his torso and other enlarged lymph nodes. DSOF at ¶ 21.[2] This change occurred over the course of weeks or months. *Id.* On August 23, 2011, Dr. David consulted with Dr. Lary, who indicated that Whiting's lymphoma might be recurring and recommended another round of CT and PET scans of his chest, abdomen, and pelvis. *Id.* at ¶¶ 21. The scans performed in September 2011 revealed that Whiting's lymphoma had recurred. *Id.* at ¶¶ 22, 42.

On September 14, 2011, after receiving the results of Whiting's scans, Dr. David conferred with Dr. Lary, who recommended high dose chemotherapy and a stem cell transplant at the Siteman Cancer Center at Barnes Jewish Hospital in St.

---

[2] In response to Paragraphs 21 to 23 of Defendants' joint statement of facts, Whiting refers to medical records from June 2011 to October 2011 that do not appear on the docket. Moreover, Whiting cannot introduce new facts in response to a Rule 56.1 statement. *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008) (holding that district court did not abuse its discretion in refusing to consider facts presented in a Rule 56.1 response as opposed to a separate statement of additional facts).

Louis, Missouri. *Id.* at ¶ 22, 51. Dr. Lary submitted these requests to Wexford and Dr. Louis Shicker, the Medical Director of the Illinois Department of Corrections ("IDOC"). *Id.* at ¶¶ 23, 27. Dr. David was initially advised that IDOC did not cover stem cell transplants, so Whiting's family would have to apply for clemency or commutation of his sentence. *Id.* at ¶ 23. Dr. David subsequently learned that Dr. Shicker was working to obtain IDOC's approval for the recommended treatments. *Id.* at ¶ 27. IDOC ultimately approved both a second round of chemotherapy for Whiting and a stem cell transplant. *Id.* at ¶ 28.

After Whiting's lymphoma recurred, he received pain medication and twenty-four hour monitoring in the Shawnee Correctional Center infirmary. *Id.* at ¶ 24. Dr. David also explained to Whiting that he was trying to make arrangements for Whiting to receive additional chemotherapy treatment. *Id.* at ¶ 25. Whiting's condition was stable until October 5, 2011, when Dr. David noticed that Whiting was "extremely weak" and refusing to take his pain medications. *Id.* at ¶ 28. Dr. David also examined the left side of Whiting's neck, which was filled with fluid. *Id.* Based on these changes, Dr. David notified Wexford and Dr. Shicker that Whiting needed immediate hospitalization. *Id.* Dr. Shicker agreed. Whiting was transferred by ambulance

to Barnes Jewish Hospital in St. Louis on October 5, 2011. *Id*. at ¶¶ 26, 28.

The oncologist who treated Whiting at Barnes Jewish Hospital, Dr. Nancy Bartlett, testified that Whiting was "almost dead" when he arrived. *See* Dkt. No. 165-3 ("Dr. Bartlett Dep.") at 38. Whiting had low blood pressure and "huge lymph nodes all over his neck." *Id*. at 13. Whiting received chemotherapy treatment from Dr. Bartlett from October 2011 to December 2011, when a PET scan showed that his lymphoma was once again in complete remission. DSOF at ¶¶ 62-63. This was the best possible result Whiting could have achieved. *Id*. at ¶ 64. Although Dr. Bartlett encountered "some resistance" when speaking with Dr. David about the course of treatment Whiting needed, she was able to deliver all the medical care she thought was necessary and appropriate to treat his condition. *Id*. at ¶¶ 56, 61. She has no opinion about why Whiting suffered a relapse after his lymphoma went into complete remission in June 2011. *Id*. at ¶ 59, 65.

Whiting's prison sentence ended in January 2012, which triggered a change in insurance coverage that prevented him from undergoing a scheduled stem cell transplant at Barnes Jewish Hospital. *Id*. at ¶ 67. Dr. Bartlett referred Whiting to the University of Chicago Medical Center, where he received additional chemotherapy treatment and a stem cell transplant in

May 2012.  *Id*. at ¶¶ 67, 71, 106.  A biopsy performed in June 2012 revealed that Whiting's lymphoma was still present.  *Id*. at ¶ 107.  Since June 2012, Whiting has been receiving palliative chemotherapy and remains a candidate for another stem cell transplant.  *Id*. at ¶¶ 109-11.  Whiting's oncologist at the University of Chicago, Dr. Justin Kline, has no opinion about the medical treatment Whiting received at Shawnee Correctional Center, including the timing of his biopsy.  *Id*. at ¶¶ 114-15. After reviewing Whiting's medical records, however, Dr. Kline opined that Whiting would not have experienced the pain he did from October 2010 and January 2011 if his chemotherapy had started shortly after Dr. David first requested a biopsy.  *See* Dkt. No. 173-4 at ¶ 11.

## II.

Whiting sued Dr. David and Wexford--the only Defendants against whom he is still pursuing Section 1983 claims--for allegedly showing deliberate indifference to his medical condition.  *See* Dkt. No. 48 ("Second Am. Compl.").

In order to survive Dr. David's and Wexford's motions for summary judgment, Whiting must show that, when viewed in the light most favorable to his claim, "the evidence is such that a reasonable jury could return a verdict [in his favor]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## A.

"To recover against Wexford under...current [Seventh Circuit] precedent, [Whiting] must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Shields*, 746 F.3d at 796; *see also Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (applying *Monell* standard to private corporations sued under § 1983 for the first time).

In his brief opposing Wexford's motion for summary judgment, Whiting has not even attempted to identify a corporate policy, custom, or practice that caused his injuries. Instead, Whiting focuses exclusively on Wexford's denial of Dr. David's request for a biopsy and recommendation of an alternative treatment plan. *Shields* explains that such isolated treatment decisions "do not add up to a pattern of behavior that would support an inference of a custom or policy, as required to find that Wexford as an institution/corporation was deliberately indifferent to [Whiting's] needs." 746 F.3d at 796. Therefore, Wexford is entitled to summary judgment on Whiting's deliberate indifference claim.

B.

Whiting's other claim is that Dr. David's failure to order an emergency biopsy of his enlarged nodes in October 2010 constituted deliberate indifference to his medical condition.[3]

"A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The objective component requires an inmate to demonstrate that he had a "serious medical condition," meaning "one that ha[d] been diagnosed by a physician as mandating treatment or one that [was] so obvious that even a lay person would [have] perceive[d] the need for a doctor's attention." *Id*. The subjective component requires the inmate to demonstrate that prison officials acted with a culpable state of mind--i.e., that they knew of and disregarded an excessive risk to the inmate's health. *Id*.

1.

The relevant question with respect to Whiting's medical condition is whether Dr. David's decision to follow Wexford's treatment plan instead of ordering an emergency biopsy had objectively serious medical consequences. *See Jackson v.*

_____

[3] To the extent Whiting once alleged that Dr. David was deliberately indifferent to his medical condition at any other point in time--e.g., after his lymphoma recurred in 2011-- Whiting has abandoned those arguments in his summary judgment briefing. *See Milligan v. Bd. of Trustees of Southern Ill. Univ.*, 686 F.3d 378, 386-87 (7th Cir. 2012) (failure to make an argument results in forfeiture).

*Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) (defining relevant inquiry as the medical consequences, if any, of depriving inmate of blood pressure medication for three weeks rather than whether his underlying hypertension was objectively serious).

"In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer verifying medical evidence that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 714-15 (7th Cir. 2007) (internal quotation omitted); *see also Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (adopting "verifying medical evidence" requirement). In other words, Whiting "must offer medical evidence that tends to confirm or corroborate a claim that the delay [in ordering a biopsy] was detrimental." *Williams*, 491 F.3d at 715.

Dr. David argues that the two-month delay in ordering a biopsy of Whiting's enlarged nodes did not harm him because his cancer responded to chemotherapy treatment and went into complete remission by June 2011. This is not a case like *Devbrow v. Kalu*, 705 F.3d 765 (7th Cir. 2013), where the prisoner alleged that the delay in diagnosing his cancer allowed it to spread and severely limited his treatment options. Here, Dr. Lary testified that complete remission of Whiting's lymphoma was the best possible outcome he could have achieved from

13

chemotherapy treatment.  She characterized any delay in
diagnosing Whiting's lymphoma as medically "irrelevant" because
his cancer went into complete remission.  Dr. Lary Dep. at 93.
There is no evidence that diagnosing and treating Whiting's
lymphoma sooner would have prolonged his period of remission or
reduced the odds of a relapse.  *Id.* at 47.

Whiting counters that "[n]othing in the record disproves
that early detection and treatment [of his lymphoma] in 2010
would or could not have lengthened [his] period of remission."
DSOF at ¶ 43.  That argument turns the verifying medical
evidence requirement on its head.  It is Whiting's burden to
show that the delay in diagnosing his lymphoma caused harm.  The
most Whiting can say is that Dr. Bartlett once told him that his
condition would be "different" if he had started chemotherapy
earlier.  Dkt. No. 165-4 ("Whiting Dep.") at 72.  That testimony
is vague as how Whiting's condition would be different.
Moreover, Dr. Bartlett expressly declined to give an opinion
about why Whiting's lymphoma recurred after going into complete
remission by June 2011.  Dr. Bartlett Dep. 46.

The objective component of Whiting's deliberate
indifference claim boils down to whether the two-month delay in
diagnosing his lymphoma inflicted unnecessary pain.  *See Smith
v. Know County* Jail, 666 F.3d 1037, 1039-40 (7th Cir. 2012) (per
curiam) (noting that "even if [prisoner's] condition did not

worsen from the delay [in treatment], deliberate indifference to prolonged, unnecessary pain can itself be the basis for an Eighth Amendment claim"). Whiting has presented medical records showing that he suffered pain between October 2010 and December 2010 because of his enlarged nodes. *See Williams*, 491 F.3d at 716 (holding that medical records constituted "verifying medical evidence" from which a jury could have concluded that delay in treatment "unnecessarily prolonged and exacerbated" inmate's pain). Dr. Kline has also said that Whiting "would not have experienced the pain he did between October 27, 2010 and January 2011" if he had started chemotherapy treatment shortly after Dr. David first requested a biopsy. Dkt. No. 173-4 at ¶ 11.

In sum, Whiting has presented sufficient evidence that the two-month delaying in diagnosing his lymphoma resulted in objectively serious pain.

2.

The next question is whether Dr. David was deliberately indifferent to the pain Whiting experienced from his undiagnosed lymphoma.

"A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)). Whiting

must present evidence from which a reasonable jury could find that Dr. David's decision not to order an emergency biopsy before December 2010 was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that [he]...did not base the decision on...a [medical] judgment." *Collignon*, 163 F.3d at 988 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982)).

Whiting's claim against Dr. David bears striking similarities to *Duckworth v. Ahmad*, 532 F.3d 675 (7th Cir. 2008), where the Seventh Circuit affirmed the grant of summary judgment to two prison physicians who allegedly should have ordered a cystoscopy to rule out bladder cancer--Duckworth's eventual diagnosis--as soon as they noticed blood in his urine. The second physician who treated Duckworth, Dr. Francis Kayira, "was aware that [bladder] cancer was a risk but erroneously thought that another condition [i.e., a urinary tract infection or kidney stones] was more likely causing Duckworth's symptoms." *Id*. at 680.  Dr. David was in essentially the same position as Dr. Kayira when he accepted Wexford's alternative treatment plan despite his lingering concern that Whiting might have lymphoma. The antibiotics Whiting received were not "obviously ineffective" such that Dr. David's decision to persist in that course of treatment for one to two months amounted to deliberate indifference.  *Id*. at 682.  Whiting's condition actually

improved for a short period of time after Dr. David implemented Wexford's recommended course of antibiotics. When Whiting's condition declined, Dr. David's resubmitted his request for a biopsy, which was approved. *Cf*. *id*. (noting that Dr. Kayira ordered "more advanced testing" as Duckworth's condition worsened).

The Seventh Circuit's explanation of why Dr. Kayira was entitled to summary judgment in *Duckworth* applies with equal force to Dr. David:

> [T]here is no evidence that Kayira knew of and disregarded the risk of cancer even if he was aware that it was a possibility. Duckworth points to the expert testimony of an experienced urologist stating that cancer should always be ruled out first before other conditions when a patient has gross hematuria. This may be a fair statement of how a reasonable doctor would treat Duckworth's symptoms, but it does not shed any light into Dr. Kayira's state of mind. Nor did Dr. Kayira's chosen course of treatment so depart from accepted professional practice as to allow the jury to infer indifference. Dr. Kayira tried to cure what he thought was wrong with Duckworth, an opinion he arrived at using medical judgment...[I]t may have been prudent for Dr. Kayira to rule cancer out first. But this is just to reiterate the standard for medical malpractice, which falls short of deliberate indifference.

532 F.3d at 681.

In sum, no reasonable jury could find that Dr. David's decision to follow a Wexford's treatment plan instead of ordering an emergency biopsy of Whiting's enlarged nodes

amounted to deliberate indifference.  Therefore, Dr. David is entitled to summary judgment.

III.

Dr. David's and Wexford's motions for summary judgment are GRANTED for the reasons stated above.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: February 27, 2015